UNITED STATES, Appellee,

v.

Sergeant Addis G. WILEY, 124–60–9328,
United States Army, Appellant.

ACMR 9101188.

U.S. Army Court of Military Review.

29 June 1993.

For Appellant: Captain Robert L. Carey, JAGC (argued); Colonel Malcolm H. Squires, Jr., JAGC, Captain Robin N. Swope, JAGC, Captain Kurt J. Mayer, JAGC (on brief).

For Appellee: Captain Louis E. Peraertz, JAGC (argued); Colonel Dayton M. Cramer, JAGC, Lieutenant Colonel Joseph A. Russelburg, JAGC, Major Kenneth T. Grant, JAGC, Captain Maria S.L. Chapa, JAGC (on brief).

Before CREAN, WALCZAK, and GONZALES, Appellate Military Judges.

## OPINION OF THE COURT ON RECONSIDERATION

**CREAN, Senior Judge:**

A military judge sitting as a general court-martial found the appellant guilty, contrary to his pleas, of desertion with intent to avoid hazardous duty and shirk important service and missing movement through design, in violation of Articles 85 and 87, Uniform Code of Military Justice, 10 U.S.C. §§ 885 and 887 (1988) [hereinafter UCMJ]. The convening authority approved the adjudged sentence of a bad-conduct discharge, confinement for nine months, and reduction to Private E1.

This Court issued an opinion in this case on 18 June 1993. On 23 June 1993, the government requested reconsideration of that opinion pointing out a factual error in the opinion. The request for reconsideration is granted and the opinion of 18 June 1993 is vacated.

The appellant contests the validity of Desert Shield Personnel Message Number 31 (Appendix) [hereinafter DSPM 31][1] and the effect it had on when he could submit a request for discharge as a conscientious objector. This is one of the rare instances when this Court is required to determine the correctness of an administrative regulation because of its effect on the lawfulness of a commander's order and the enforcement of that order by the prosecution of a soldier under the UCMJ. We find that DSPM 31 wrongly changed Army Regulations and the commander's order to the appellant to deploy was thereby unlawful. We agree with the holding and rationale of our brothers on Panel 4 of this Court in *United States v. Johnson,* 37 M.J. 982 (A.C.M.R.1993). Accordingly, the findings of guilty to desertion and missing movement must be set aside. However, a finding of guilty to the lesser included offense of absence without leave is affirmed and the sentence is reassessed.

This Court initially heard argument in this case on 5 January 1993. Confusion reigned supreme. Counsel for neither side could explain the rationale and meaning of DSPM 31, the legality of the commander's order in view of DSPM 31, nor the effect of DSPM 31 on the eligibility of the appellant to deploy. We specified certain issues for government response and requested affidavits to provide some clarification of DSPM 31. It was our opinion that it was difficult to render a precise legal opinion when the source documents were so imprecise. The

**1.** Message, HQ, Dep't of Army, DAPE–MPA/ DAMO–OD–ADC, 191400Z, Oct 90, subject: Desert Shield Personnel Message Number 31—Personnel Applying for Conscientious Objector Status.

government provided affidavits from the proponents of DSPM 31 and additional argument was heard on 11 May 1993.

## I. DSPM 31's Effect on Conscientious Objector Applications

This Court and a Federal District Court have previously reviewed DSPM 31. *United States v. Morse*, 34 M.J. 677 (A.C.M.R. 1992) (the Army could properly amend a regulation by message, however, DSPM 31 was not a change to a regulation but was interpretative guidance); *Pruner v. Department of the Army*, 755 F.Supp. 362 (D.Kan.1991) (DSPM 31 was an internal personnel matter and exempt from the requirement to publish in the Federal Register); *United States v. Pruner*, 37 M.J. 573 (A.C.M.R.1993) (affirming conviction for desertion where appellant, even after DSPM 31, was given the opportunity to submit an application for conscientious objector status [hereinafter CO status], but after submitting a request, appellant left his unit); *United States v. Johnson*, ACMR 9100315 (A.C.M.R. 4 March 1992) (unpub.)[2] (challenging the lawfulness of DSPM 31). In this case, we must first determine the effect of DSPM 31 on the appellant's eligibility to submit an application for conscientious objector status and, secondly, his eligibility for deployment and, therefore, the lawfulness of the commander's order to deploy for Operation Desert Shield/Storm.

The consideration of military members as conscientious objectors is governed by Department of Defense Directive 1300.6, subject: Conscientious Objectors, (20 August 1971) [hereinafter DOD 1300.6]. The Army has implemented this directive in Army Regulation 600–43, Personnel—General: Conscientious Objection, (7 August 1987) [hereinafter AR 600–43]. Department of Defense Directive 1300.6 leaves it to each military service to determine when an application for conscientious objection can be filed and the status of the servicemember after the application is filed. DOD 1300.6, para. IV(B).

The basic Army rule is that a soldier who submits an application for CO status remains with his unit and is given duties minimally conflicting with his religious beliefs until the application is acted on by Department of the Army. AR 600–43, para. 2–10(a). If a soldier receives "orders for reassignment" and has not submitted an application for CO status, then the soldier cannot submit the application until arrival at the new permanent duty station. This simple rule is complicated when the reassignment is to a unit overseas. If the transfer is for a normal reassignment overseas, the Army has determined that the applicant is ineligible for overseas assignment when CO status is "claimed". Army Reg. 614–30, Assignments, Details, and Transfers: Overseas Service, table 2–1, rule 29, (1 April 1988). [hereinafter AR 614–30]. If the movement overseas is part of a contingency or M–Day operation, the soldier is ineligible for movement if a "formal" application[3] has been submitted. AR 614–30, table 3–1, rule 8.[4]

Desert Shield Personnel Message 31 stated that deployment for AR 600–43 purposes was equivalent to "reassignment". Thus, a soldier whose unit had been alerted for deployment, could not submit an application for CO status until after arrival at the new duty location. *See*, AR 600–43, para. 2–10(c). It further stated that AR 614–30, table 3–1, meant that a soldier who had not filed a formal application for CO status before his unit had been alerted for

---

**2.** Although previously published as a Memorandum Opinion, this case is now attached as an Appendix to *United States v. Johnson*, 37 M.J. 982 (A.C.M.R.1993).

**3.** A formal application requires the submission of a DA Form 4187 and the information contained in AR 600–43, Appendix B. *See* AR 600–43, para. 2–1(a).

**4.** Operation Desert Shield/Storm was a contingency operation. On 12 August 1990, President Bush issued Executive Order 12727 authorizing a Presidential Selected Reserve Order to active duty under the provisions of 10 U.S.C. 673(b). The appellant's parent unit, 3d Armored Division, was alerted for deployment on 8 November 1990 when President Bush announced that more troops would be sent to Southwest Asia and Secretary of Defense Cheney and Chairman of the Joint Chiefs of Staff, General Powell, announced that European-based units, including the 3d Armored Division, would be deployed to Southwest Asia.

deployment could not submit an application for CO status until arrival at the new duty location. The message also makes a distinction between soldiers serving at CONUS locations and those overseas. If the soldier was in an overseas unit, he would remain with that unit. Paragraph 4 of DSPM 31 makes little sense when read with the other paragraphs of the message. The only logical reading is that the soldier serving in an overseas unit could submit the request for CO status at any time and remain in his unit until the request is processed.[5] This means that there were two rules, one for units stationed in the United States [hereinafter CONUS] and one for units overseas.

■ Desert Shield Personnel Message Number 31 on its face did not purport to change or amend AR 600–43. The message stated that it was merely defining a term in AR 600–43. Since the proponent of DSPM 31 did not consider it a change to the regulation, it was not approved by the Secretary of the Army. However, DSPM 31 gave a much broader definition to the term "reassignment" than had been previously given under AR 600–43. A clear reading of AR 600–43 is that the term reassignment was only to include soldiers reassigned on individual orders. Army Regulation 600–43, para. 2–10(a)(c) discusses "persons" receiving orders, not units. It refers to "persons" departing units for reassignment. The term "reassignment" did not mention unit movement orders. Individuals receiving orders for reassignment could not submit an application for CO status until arrival at the "new permanent duty station". When units deploy on an operation, they do not change permanent

duty stations, they just have a different area of operations. Units, as did the appellant's unit, leave rear detachments at the home station because the unit will return to that station and not remain permanently at the new area of operations. We find that AR 600–43 merely pertained to individual orders for reassignment to a new unit and did not include unit movement orders. Accordingly, DSPM 31 was a change to AR 600–43 when it expanded the meaning of reassignment to include unit deployments. Desert Shield Personnel Message 31 looked like a change, had the affect of a change, and therefore is a change. Since DSPM 31 was an unlawful change to the regulation because it had not been approved by the Secretary of the Army and did not meet the other requirements for a regulatory change. See Army Reg. 25–30, The Army Integrated Publishing and Printing Program, para. 2–52(b) (27 March 1989). We hold that DSPM 31, was an improper change to AR 600–43, had no effect on AR 614–30, and soldiers could submit an application for CO status at any time up until deployment.[6]

■ We agree with the District Court and this Court's earlier opinions in *Pruner* and *Morse*, that DSPM 31 deals with an "internal personnel rule" and not substantial rules of general applicability such that publication was not required in accordance with the Administrative Procedures Act.[7] However, we disagree with the portion of *Morse* that finds that DSPM 31 was not a change to AR 600–43. In spite of this difference, we concur with the final holding of *Morse* that the orders given to Morse, under the factual circumstances of that case, by his commander, were lawful. Ad-

---

5. This reading would be consistent with the reasons expressed by the proponent of DSPM 31 that it was published mainly to cover Reserve and National Guard soldiers ordered to active duty and not intended to cover active duty soldiers.

6. Army Regulation 600–43 was in fact changed. Message, HQ, Dep't of Army, DAPE–MPA–CE, 022213Z, Jan 91, subject: Personnel Applying for Conscientious Objector Status Change in Policy. This change permits a soldier to submit an application for CO status but that submission does not affect the soldier's obligation to deploy

with his unit. The soldier will deploy with his unit unless the commanding officer exercising general court-martial authority determines that the soldier should not deploy. Army Regulation 614–30, table 3–1 is also amended to read that a soldier who has submitted a formal application for CO status is eligible to deploy on a contingency or M-day operation. This change appears to be a more·workable rule than the rule of DSPM 31.

7. Administrative Procedures Act, 5 U.S.C. § 552(b)(2).

ditionally, this case is distinguished factually from *Pruner* because, in that case, the accused, contrary to the requirements of DSPM 31, was permitted to submit his application for conscientious objector status but deserted his unit after his application was submitted.

## II. Affect on the Appellant

The appellant was assigned to a mechanized infantry battalion of the 3d Armored Division. The 3d Armored Division was alerted for deployment to Southwest Asia on 8 November 1990. The appellant went on leave from approximately 16 November 1990 to 29 November 1990. During his leave, the appellant solidified his religious beliefs and was now opposed to war of all kinds. On 11 December 1990, the appellant gave a letter to his company commander, Captain Forshee, "claiming" CO status and "resigning" from the Army. Captain Forshee arranged for the appellant to talk to the battalion chaplain, Chaplain Howell. The appellant spoke with Chaplain Howell on 12 December 1990. Chaplain Howell informed the appellant of the required material needed to submit a request for CO status.

The appellant submitted a request for CO status to his first sergeant, First Sergeant (1SG) Soules, on 13 December 1990. Later that same day, the appellant asked 1SG Soules if the application had been given to Captain Forshee. First Sergeant Soules told the appellant that he did not remember receiving the application. Sometime between 14 and 20 December 1990, the appellant returned to see Chaplain Howell and this time, the chaplain personally typed for the appellant a DA Form 4187 requesting CO status. The form was dated 13 December 1990, the date the appellant submitted the original application to 1SG Soules.

On 20 December 1990, the appellant again gave an application for CO status to 1SG Soules. First Sergeant Soules told the appellant that he could not submit the application until he had arrived in Southwest Asia because DSPM 31 prohibited him from submitting the application. First Sergeant

Soules testified that he did not remember if he returned the application to the appellant, sent it back to the appellant through his platoon chain of command, or gave it to the company commander. The company commander remembered burning, along with other papers just before crossing the border into Iraq in February 1991, an application by the appellant for CO status.

In any event, the appellant received a written order from Captain Forshee on 20 December 1990 to deploy with the unit on 24 December 1990. The appellant failed to deploy with his unit and missed the movement of the unit. He was absent from his unit from 24 December 1990 until 27 December 1990 when he voluntarily returned to the unit's rear detachment in Frankfurt, Germany.

▉ The appellant submitted applications for CO Status to his first sergeant on 13 and 20 December 1990. The government has correctly noted in its request for reconsideration that neither application met the requirements of AR 600–43, para. 2–1(a) for a formal application. The appellant consulted his battalion chaplain twice on how to submit for CO status and the chaplain personally typed the form for him. The appellant submitted to his first sergeant what the appellant believed to be a correct formal application for CO status. The first sergeant did not inform the appellant that the application did not meet the requirements of AR 600–43, probably because the first sergeant did not know that it did not meet the requirements. We find, under the circumstances of this case, that the appellant made a good faith effort to submit a correct formal application for CO status. While his application did not meet the requirements for a formal application, we will, however, consider that he did file a formal application. Since the appellant is considered to have filed a formal application and since AR 600–43 and AR 614–30, table 3–1, rule 8 applied, the appellant was in the class of soldiers that the Secretary of the Army had designated as not eligible for deployment when the appellant received the order to deploy on 20 December 1990 and when the unit deployed on 24 Decem-

ber 1990, Since he was not eligible for deployment to Southwest Asia, the appellant's commander's order to deploy was unlawful. Since the order to deploy was unlawful, the appellant did not desert his unit to avoid hazardous duty or shirk important service nor miss a movement merely by failing to make the unit movement. Accordingly, the findings of guilty of desertion and missing movement cannot stand.[8] However, since the appellant left his unit from 24 December 1990 to 27 December 1990, rather than remain with the unit's rear detachment, a finding of guilty of absence without leave under Article 86, UCMJ can be affirmed.

 Even if we find that DSPM 31 was not a change to the regulation and therefore its rules were applicable to this appellant, we would still reach the same result as above. Paragraph 4, DSPM 31, promulgates a rule that soldiers overseas remain with their units pending action by Department of the Army. This rule seems to be merely a restatement of the rules under AR 600–43, para. 2–10(a) and it did not change the timing of when a soldier can submit an application. Since the proponents of DSPM 31 thought it necessary to make a comment on soldiers overseas, they must have intended a different rule than the rule for soldiers in CONUS bases. The logical interpretation of this paragraph is that soldiers in overseas units could submit an application at any time before deployment and would then remain with the unit. The appellant's commander, adhering to

paragraph 4 of DSPM 31, should have accepted the application on 20 December and had the appellant remain with his unit's rear detachment. The appellant would be in the category of personnel covered by AR 614–30, table 3–1, rule 8 and not subject to deployment and, therefore, Captain Forshee's order would be unlawful.

We have also carefully considered the matters raised personally by the appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A.1982), and find them without merit. The other assignments of error raised by the appellant are mooted by this opinion.

The Court affirms only so much of the findings of guilty of Additional Charge I and its Specification as finds that the appellant did, on or about 24 December 1990, absent himself from his unit, without proper authority, until 27 December 1990, in violation of Article 86, UCMJ. The Court sets aside the findings of guilty of Additional Charge II and its Specification are dismissed. Reassessing the sentence based on the errors noted and the approved findings of guilty, and the entire record of trial, and *United States v. Sales*, 22 M.J. 305 (C.M.A.1986), the Court affirms only so much of the sentence as provides for a reduction to Specialist (E–4) and forfeiture of $500.00 pay per month for one month.

Judge WALCZAK and Judge GONZALES concur.

---

**8.** The prosecution may have been able to convict the appellant of desertion with intent to shirk important service, the important service being at his unit location in Germany. *See Pruner* 37 M.J. at 577 (A.C.M.R.1993); *United* States v. Swanholm, 36 M.J. 743, 745 (A.C.M.R. 1992). However, the government presented no evidence as to any important service in Germany.

APPENDIX 3

# UNCLASSIFIED

OPERATIONS
SUPPORT DIRECTORATE

•DEDICATED TO •
•EXCELLENCE IN •
•COMMUNICATIONS•

•••THINK VIDEO••••
•TELECONFERENCING•
•••CALL 697-8840••

PRIORITY/ROUTINE ZYUW RUEADWD845B 2930215
P R 191400Z OCT 90 ZOC ZEO T ALL US ARMY REPS AND ACTIVITIES
FM HQDA WASHDC //DAPE-MPA/DAMO-OD-AOC//
TO ALARACT

UNCLAS ALARACT 089/90
SUBJECT: DESERT SHIELD PERSONNEL MESSAGE NUMBER 31
 - PERSONNEL APPLYING FOR CONSCIENTIOUS OBJECTOR STATUS
A. AR 600-43, CHAPTER 2.
B. AR 614-30, CHAPTER 4, TABLE 3-1.
1. FOR THE PURPOSES OF AR 600-43, PARAGRAPH 2-10C, THE TERM
"REASSIGNMENT INCLUDES THE DEPLOYMENT OF PERSONNEL AWAY FROM THEIR
PRESENT DUTY LOCATION.
2. NOTICE OF "REASSIGNMENT", TO INCLUDE AN ALERT FOR DEPLOYMENT,
TEMPORARILY PRECLUDES SOLDIERS FROM SUBMITTING APPLICATIONS FOR
CONSCIENTIOUS OBJECTOR STATUS UNTIL AFTER THEY HAVE ARRIVED AT
THEIR NEW DUTY LOCATION.
3. AR 614-30, TABLE 3-1, RULE 8 APPLIES ONLY TO THOSE SOLDIERS WHO
HAVE SUBMITTED A FORMAL APPLICATION FOR CONSCIENTIOUS OBJECTOR
STATUS, PURSUANT TO AR 600-43, PRIOR TO RECEIVING NOTICE OF
"REASSIGNMENT". A FORMAL APPLICATION CONSIST OF DA FORM 4187 AND
ALL OF THE PERSONAL INFORMATION REQUIRED BY APPENDIX B, AR 600-43
4. SOLDIERS SUBMITTING APPLICATIONS FROM UNITS THAT ARE DEPLOYED
OVERSEAS WILL BE RETAINED IN THEIR UNIT AND ASSIGNED DUTIES
PROVIDING MINIMUM PRACTICABLE CONFLICT WITH THIER ASSERTED BELIEFS
PENDING FINAL DECISION OF THEIR APPLICATION.
5. HQDA POINT OF CONTACT IS LTC RONALD L. HORNE, AV 225-0895 OR
COMMERCIAL (703) 695-0895.
EXPIRATION DATE CANNOT BE PREDETERMINED
BT

ACTION SAFM(4) DACH(2) DAEN-ZC(2) RETURN TO MRO(1) (A,F)
 SAPA(2) DAJA(2) DALO(16) DAAR(2) DASG(4) NGB(2)
 SALL(2) DAMO-ADC(1) ADC-DAMI WATCH(1) ASQNS-DSD(1)
 SAAG(1) DACS(30) SAIG(2) DAMI(2) DAMO(6) DAPE(8)
 SASA(2) A&R SECTION(1) SAIS(4) SAILE(1) SACW(1)
 SARD(1)
INFO SCB REVIEW(1)

Enclosure 2

UNCLASSIFIED